47

Argued and submitted February 10, reversed and remanded May 24, petition for rehearing denied July 19, 1983

SOUTHERN PACIFIC TRANSPORTATION
COMPANY,
*Respondent,*
*v.*
DEPARTMENT OF REVENUE,
*Appellant.*

(OTC 1093, SC 28807; OTC 1189, SC 28808;
OTC 1282, SC 28809; OTC 1362, SC 28810)
(consolidated)

664 P2d 401

Elizabeth S. Stockdale, Assistant Attorney General, Salem, argued the cause for appellant. With her on the briefs was Dave Frohnmayer, Attorney General, Salem.

John H. Doran, Portland, argued the cause for respondent. With him on the brief were George L. Kirklin and Spears, Lubersky, Campbell & Bledsoe, Portland.

Before Lent, Chief Justice, and Peterson, Campbell, Carson and Jones, Justices.

JONES, J.

**JONES, J.**

Oregon's statute for assessing the property of designated utilities permits valuing the entire property of the business, both within and without the state, as a unit. The sole issue in this case is whether the property of one such utility includes the properties of an out-of-state affiliate. The problem to be resolved is the test for determining the scope of the valuation unit.

Plaintiff Southern Pacific Transportation Company (Southern Pacific) is a railroad operating in Oregon and seven other states. The St. Louis & Southwestern Railroad (Cottonbelt) is a midwestern railroad affiliated with and almost wholly owned by Southern Pacific. The Tax Court held that the Southern Pacific unit does not include the Cottonbelt. We hold that the Cottonbelt properties are included in Southern Pacific's property, and accordingly reverse and remand.

## I. FACTS

The facts relevant to this appeal are not in dispute.

Southern Pacific is a Delaware corporation wholly owned by a holding company.[1] It is a class I railroad subject to the Interstate Commerce Act, 49 USC § 10501(a) (1980 supp), and operates in Oregon, California, Nevada, Utah, Arizona, New Mexico, Texas, and Louisiana. It has three main lines: a north-south route from Portland to Southern California, an east-west route from San Francisco to Ogden, Utah, and an east-west route from Los Angeles to Texas and Louisiana. At the termini of these routes, it connects with other lines, including the Cottonbelt in Texas and Louisiana.

The Cottonbelt is also a class I railroad, operating in Tennessee, Illinois, Missouri, Arkansas, Louisiana, and Texas. In 1930, the two lines agreed to coordinate their service. Southern Pacific began acquiring Cottonbelt's stock, acquired stock control in the early 1950's, and by 1978 had acquired 99.7 percent ownership. The principal officers and almost all the directors of Cottonbelt are officers or employees of Southern Pacific,

---

[1] Plaintiff here is Southern Pacific Transportation Company. It is wholly owned by Southern Pacific Company. The term "Southern Pacific" in this opinion refers to the Transportation Company. Cottonbelt is owned by the Transportation Company, not by the holding company.

selected by and reporting to Southern Pacific. These ties of coordination, ownership, and control benefit both lines.

Ninety percent of Southern Pacific's operations are as originator and terminator of railroad traffic, while over half of Cottonbelt's traffic is as a "bridge" or intermediate for other carriers. Because terminal and switching activities are relatively unprofitable, Southern Pacific is less profitable in terms of its size than is Cottonbelt.[2] Consequently, Cottonbelt's capitalized income is greater in proportion to other measures of its size and value.

From 1972 to 1979, the Department of Revenue (Department) included Cottonbelt in the unit for valuing Southern Pacific's property. This was unchallenged for the years before 1976. The present action began when Southern Pacific filed four essentially identical complaints seeking reduction of its ad valorem tax assessments for the years 1976, 1977, 1978 and 1979. The complaint is within the jurisdiction of the Tax Court. ORS 308.595(3). The Tax Court consolidated the complaints for trial and they are consolidated here. The complaints challenge (1) the valuation unit, (2) the valuation method, and (3) the proper allocation to Oregon of a portion of the total value. The parties stipulated that five small unprofitable railroads operating in California, wholly owned by Southern Pacific, would be included in Southern Pacific's valuation unit.

With minor exceptions, the Tax Court found for plaintiff Southern Pacific on all three questions. The Cottonbelt was excluded from the valuation unit. The Tax Court's method for valuation assigned no weight to costs, 67 percent weight to capitalized income, and 33 percent weight to stock and debt. The allocation formula assigned 40 percent weight to property investment, 45 percent weight to ton-miles of revenue freight, and 15 percent weight to tonnage originating or terminating within the state. The Department appeals the valuation unit but not the method for valuation or for allocation. Southern Pacific did not cross-appeal.

---

[2] During the relevant four years Cottonbelt averaged 88 percent of the net income of Southern Pacific although it has only 13 to 19 percent of the assets, equity and revenue.

The Tax Court agreed with plaintiff that Cottonbelt should be excluded from the Southern Pacific unit because the two lines are separate in the following ways:[3]

(1) *Accounting and reporting:* separate ledgers, internal books, payroll, inventory, budget records and external audit; separate Interstate Commerce Commission reports and tariffs and Securities and Exchange Commission filings.

(2) *Corporate structure:* separate corporate forms and separate shareholder reports and meetings.

(3) *Marketing:* separate solicitation, advertising and competition for traffic.

(4) *Financing:* separate rating and marketing of long-term debt and equipment trust obligations; separate handling of cash through lock boxes, bank accounts and liquid investment.

(5) *Management:* separate day-to-day purchase (or lease) and repair of equipment, including budgeting, financing, ordering and billing.

(6) *Operations:* separate operating rules and engineering design.

(7) *Labor:* separate operating crews, retirement programs, and seniority under union rules.

(8) *Taxation:* separate corporate and franchise taxation by other states; separate property taxation in the states where both operate and in nearly all states where one operates.

(9) *Economic interdependence and geography:* the Oregon operations of Southern Pacific are only remotely connected to the Cottonbelt through a roundabout southerly route.

In its appeal, the Department observes that the two lines are integrated in the following ways:

---

[3] We have grouped the facts of separation and integration under headings.

(1a) *Accounting and reporting:* integrated billing for repairs and management services; integrated managerial accounting decisions.

(2a) *Corporate Structure:* integrated financial headquarters; stock control relation of parent to subsidiary; overlap of top officers.

(3a) *Marketing:* integrated advertising decisions.

(4a) *Financing:* integrated policy decisions about budget, finance, forecasting and investment; integrated insurance.

(5a) *Management:* integrated top management services, including legal, capital-investment and managerial personnel decisions by Southern Pacific or its holding company; overlap of top managers.

(6a) *Operations:* integrated executive supervision and inspection of mechanical operations; integrated research.

(7a) *Labor:* integrated stock-ownership plan, training and education for employees.

(8a) *Taxation:* integrated property taxation in California.

(9a) *Economic interdependence and geography:* extensive contractual coordination; physical connection.

Neither party substantially disputes these historical facts of separation and integration. Both parties also note the extent of operational interconnection in the industry generally. The nation's railroads interchange cars, materials, and running repairs, maintain joint inspections and facilities, permit one carrier's locomotives to run through the lines of another, use standardized equipment and central computer monitoring of traffic, and support industry-wide research.

## II. THE CENTRAL ASSESSMENT STATUTE

This case is governed by a statute, ORS 308.505 to 308.665, which imposes standards and procedures for assessing the ad valorem property tax of designated public utilities. We have said that this statute is "intended to be a complete and comprehensive scheme of taxation," *State v. Wells, Fargo & Co.,* 64 Or 421, 432, 130 P 983, 985 (1913), although it may be more accurately described as a scheme of assessment for taxation. It has not changed markedly since first enacted by Oregon Laws

1909, chapter 218 (1909 Act). It provides for assessment of property, not income or franchises. *Portland v. Portland Railway, Light & Power Co.*, 80 Or 271, 294, 156 P 1058 (1916).

This statute authorizes the Department to assess property when two conditions are met: the property has a situs in this state, and it is used in certain designated utility businesses, including railroading. ORS 308.515(1).[4] The statute requires these utilities to be centrally assessed, *i.e.*, assessed by the Department rather than by the counties.

The basic allocation rule is that all property of such a company is assessed "to the property user," ORS 308.517(1). Property is subject to the assessment only if put to one of the designated uses; an included corporation is excluded to the extent that it actively engages in a business "not incidental" to that designated, ORS 308.515(4). If property has an "integrated use" in more than one business, it is to be "classified by the department as being within or without the definition of property * * * according to the primary use," ORS 308.510(5).[5]

---

[4] ORS 308.515(1) enumerates various railroad operations as within the designated scope of the tax:

"The Department of Revenue shall make an annual assessment * * * of the following property having a situs in this state:

"(a) Except as provided in subsection (2) of this section [pertaining to certain water transportation companies], any property used or held for its own future use by any company in performing or maintaining any of the following businesses or services or in selling any of the following commodities, whether in domestic or interstate commerce or both, and whether mutually, or for hire, sale or consumption by other persons: Railroad transportation; railroad switching and terminal; electric rail and trackless trolley transportation; sleeping car; refrigerator car; private car; tank car; * * * railway express; communication * * *.

"(b) Refrigeration, tank and private cars of all companies not included in paragraph (a) of this subsection, where such cars are rented, leased or used in railroad transportation for hire."

[5] ORS 308.517(1):

"Except as provided in subsections (2) and (3) of this section [pertaining to certain assignments], the Department of Revenue shall assess to the property user all property owned, leased, rented, chartered or otherwise held for or used by it in performing a business, service or sale of a commodity enumerated in ORS 308.515."

When property is rented, leased, chartered or otherwise assigned, the property is taxed to the person who gets its "use or benefit," ORS 308.510(4)(a).

ORS 308.515(4):

"Any corporation included within subsection (1) of this section, to the extent that it actively engages in any business or service not described therein or not

As used in this statute, the term "property having situs in this state" is defined in ORS 308.505(3),[6] and the term "property" is defined in ORS 308.510(1).[7] The definition of the term "property" applies to the entire statutory scheme, and therefore applies to the definition of "property having situs in

---

> incidental to any business or service or sale of a commodity described therein, shall not to that extent be deemed a corporation whose properties are assessed under ORS 308.505 to 308.730."

ORS 308.510(5):

> "Property found by the department to have an integrated use for or in more than one business, service or sale, where at least one such business, service or sale is one enumerated in ORS 308.515, shall be classified by the department as being within or without the definition of property under subsection (1) of this section, according to the primary use of such property, as determined by the department."

[6] ORS 308.505(3):

> "As used in ORS 308.505 to 308.730:
>
> "* * * * *
>
> "(3) 'Property having situs in this state' includes all property, real and personal, of a company, owned, leased, used, operated or occupied by it and situated wholly within the state, and, as determined under ORS 308.550, 308.555 and 308.640, such proportion of the movable, transitory or migratory personal property owned, leased, used, operated or occupied by such company, including but not limited to watercraft, aircraft, rolling stock, vehicles and cars, and construction equipment, as is used partly within and partly without the state."

This definition now clearly presupposes that all types of "property" can be situated within or without the state. The phrase "situated wholly within the state" was added by Or Laws 1957, ch 711, § 1, but as plaintiff observes, this limitation was implicit even in the original statute, quoted *infra* n 8.

[7] ORS 308.510(1):

> " 'Property,' as used in ORS 308.505 to 308.730, includes all property, real and personal, tangible and intangible, used or held by a company as owner, occupant, lessee, or otherwise, for or in use in the performance or maintenance of a business or service or in a sale of any commodity, as set forth in ORS 308.515, whether or not such activity is pursuant to any franchise, and includes but is not limited to the lands and buildings, rights of way, roadbed, water powers, vehicles, cars, rolling stock, tracks, wagons, horses, office furniture, telegraph, telephone and transmission lines, poles, wires, conduits, switchboards, machinery, appliances, appurtenances, docks, watercraft irrespective of the place of registry or enrollment, merchandise, inventories, tools, equipment, machinery, franchises and special franchises, work in progress and all other goods or chattels; but does not include items of intangible property that represent claims on other property including money at interest, bonds, notes, claims, demands and all other evidences of indebtedness, secured or unsecured, including notes, bonds or certificates secured by mortgages, and all shares of stock in corporations, joint stock companies or associations."

The exclusion following the semicolon was enacted by Or Laws 1977, ch 602, § 2. The same act exempted designated utilities from the usual definitions of tangible and intangible personal property. *See infra* note 17.

this state," which defines a class of real and personal "property" having a certain location. The natural reading of this pair of definitions is that "property" is the entire pie of which "property having a situs in this state" is a slice, so that "property" is equivalent to "property irrespective of situs." This reading was even more natural when these provisions were first enacted, since they were consecutive sections of the 1909 Act.[8]

---

[8] The predecessor of ORS 308.510(1) was first enacted by Or Laws 1909, ch 218, § 5 (emphasis in original):

"The term 'property,' as used in this act, shall be deemed to include all property, real and personal, subject to assessment for taxation under this act belonging to the corporation, or held by it as occupant, lessee, or otherwise, and shall include the rights of way, roadbed, cars, rolling-stock, tracks, wagons, horses, office furniture, telegraph, telephone and transmission poles, wires, conduits, switchboards, machinery, appliances, appurtenances, and all other property of a like or different kind, used in the carrying on of the business of said corporation, and owned, leased, or operated by them respectively, and all other real and personal property, and all franchises and special franchises; *provided, however,* that this definition shall not include, apply to, or subject to assessment for taxation by said board, such real estate as is owned and can be conveyed by such corporation under the laws of this State, which is not actually occupied in the exercise of its franchise, or in use in the operation of their corporate business, nor to the car and machine shops, grain elevators, grain warehouses, docks, bridges across the boundary rivers of the State, or the Willamette river, the water craft of any corporation, nor to the real and personal property of such corporation devoted to navigation; but such car and machine shops, grain elevators and grain warehouses, docks and bridges, water craft and property devoted to navigation so excepted, shall be liable to assessment for taxation in the same manner as other property in the State, by the several county assessors."

The predecessor of ORS 308.505(3) was first enacted by Or Laws 1909, ch 218, § 6:

"The term, 'property having a situs in this State,' shall include all property, real and personal, of the corporation included in this act, owned, leased, used, operated or occupied by them, and also such proportion of the rolling-stock, cars and other personal property of a like or different kind as is used partly within and partly without the State, as herein provided to be determined."

Plaintiff argues that a limiting qualification in the original definition of property in section 5 of the 1909 Act, "subject to assessment for taxation under this act," was geographic, and meant "having a situs in this state." But if this were true, "property" would mean the same as "property having a situs in this state," and section 6 would have been unnecessary.

The rest of section 5 shows that the qualification "subject to assessment under this act" limits the kind of property to that used in a designated business, not to that located in Oregon. The significance of assessment "under this act" was that assessment of this kind of property was centralized. The definitional exclusions contrast property "subject to assessment * * * by the [state] board" with property "liable to assessment * * * by the several county assessors."

The entire act, including the unit rule itself, distinguishes the geographic dimension from the dimension of connection with designated business centrally assessed. In the unit rule, ORS 308.555, the phrase "assessable by it [the Department]"

For purposes of this property assessment scheme, ORS 308.510(1) defines a company's "property" broadly to include "all property, real and personal, tangible and intangible, used or held by a company as owner, occupant, lessee, or otherwise, for or in use in the performance or maintenance of" its designated business. The definition of property includes all real property and "goods or chattels," but starting in 1977 has excluded "intangible * * * claims on other property" such as shares of stock in corporations.

ORS 308.555 permits unit valuation of property, whereby the Department "may value the entire property, both within and without the State of Oregon, as a unit."[9] Unit

---

contrasts with "assessable by them [the county assessors]," so the term "assessable" refers to the locus of assessing authority, not the locus of the property. *See also* ORS 308.517(5):

> "All property not assessed by the Department of Revenue shall be assessed in accordance with law by the assessor of the county in which such property is situated."

Thus, the term "assessable" and its cognates identify *who*, the state or the county, will assess various properties, based on the *kind of use* to which the property is put. Central assessment does not depend on *where* the property is located.

This interpretation is confirmed by the fact that the phrase "subject to assessment" was deleted in 1957 by an act whose purpose was to clarify the division of assessment responsibility between state and local agencies. Or Laws 1957, ch 711, § 2. The proponent of the 1957 bill described it as "a clarification of the law as to what property is to be assessed by the commission and what property is to be assessed by the local assessor." Minutes, Senate Taxation Comm., May 1, 1957, p 1. He "summarised *[sic]* the bill. It came about because of question as to who should appraise certain property - county assessor or commission - in regard to utility property. This bill clarifies the question." Minutes, Senate Taxation Comm., April 30, 1957, p 4.

Although we reject plaintiff's reading of the statute, we are grateful to counsel for collecting its history.

[9] ORS 308.555 provides:

> "The department, for the purpose of arriving at the true cash value of the property assessable by it, may value the entire property, both within and without the State of Oregon, as a unit. If it values the entire property as a unit, either within or without the State of Oregon, or both, the department shall make deductions of the property of the company situated outside the state, and not connected directly with the business thereof, as may be just, to the end that the fair proportion of the property of the company in this state may be ascertained. If the department values the entire property within the State of Oregon as a unit, it shall make deductions of the property of the company situated in Oregon, and assessed by the county assessors, to an amount that shall be just. For that purpose the county assessors shall, if the department so requests, certify to the department the true cash value of the property of the companies assessable by them, but such certification of true cash value is intended to be advisory only and is not conclusive upon the department."

The predecessor of ORS 308.555 was first enacted in almost the present form by Or Laws 1909, ch 218, § 10.

valuation assesses the going-concern value of a multi-state operation, and its constitutionality has long been established.[10] If "the entire property" is valued as a unit, then the allocation of a portion of that entire value to Oregon must be "just" and in "fair proportion." ORS 308.555; *see also* ORS 308.550(2). This statutory limit on the range of permissible allocation is vague, but codifies the limit imposed by the commerce and due process clauses of the federal constitution.[11]

The definition of the term "property" in ORS 308.510(1) applies to the term "entire property" in the unit rule, ORS 308.555. The adjective "entire" appears to be synonymous with the phrase that follows, "both within and without the state of Oregon," so that "entire" simply emphasizes that property is included in the valuation unit irrespective of situs. The unit rule does not tax out-of-state property; rather, it assesses the increment of going-concern value that out-of-state property adds to taxable in-state property.

The user of property is a "corporation" or "company," expansively defined to include any of various forms of

---

[10] *See, Pullman Co. v. Richardson,* 261 US 330, 338, 43 S Ct 366, 67 L Ed 682 (1923); *Adams Express Co. v. Ohio St. Auditor,* 165 US 194, 219-22, 17 S Ct 305, 41 L Ed 683 (1897); *Cleveland Railway Co. v. Backus,* 154 US 439, 443-45, 14 S Ct 1122, 38 L Ed 1041 (1894); *Taylor v. Secor,* 92 US 575, 608-09, 23 L Ed 663 (1875) *("State Railroad Tax Cases").*

This 1894 statement of Justice Brewer is as relevant today as it was then:

"* * * The true value of a line of railroad is something more than an aggregation of the values of separate parts of it, operated separately. It is the aggregate of those values plus that arising from a connected operation of the whole, and each part of the road contributes not merely the value arising from its independent operation, but its mileage proportion of that flowing from a continuous and connected operation of the whole. * * * Now, when a road runs into two States each State is entitled to consider as within its territorial jurisdiction and subject to the burdens of its taxes what may perhaps not inaccurately be described as the proportionate share of the value flowing from the operation of the entire mileage as a single continuous road. It is not bound to enter upon a disintegration of values and attempt to extract from the total value of the entire property that which would exist if the miles of road within the State were operated separately. * * *" *Cleveland Railway Co. v. Backus, supra,* 154 US at 444-45.

[11] *See, Norfolk & Western Railway Co. v. Missouri Tax Comm.,* 390 US 317, 323-25, 88 S Ct 995, 19 L Ed 2d 1201 (1968); *Smith v. Columbia County,* 216 Or 662, 686-88, 341 P2d 540 (1959). However, as we noted in *Budget Rent-A-Car v. Multnomah Co.,* 287 Or 93, 104-05, 597 P2d 1232 (1979):

"* * * Insofar as constitutional rules are in the first instance directives to state and local lawmakers, a rule to be 'fair' or 'just' makes a limited contribution to difficult and controversial debates over tax sources and rates. * * *"

The same holds true of fairness and justice as directives to state tax assessors.

organization engaged in a designated business, ORS 308.505(2).[12] A parent corporation together with a subsidiary can be a "corporation" or "company" within this definition. If the unit rule is applied here, then the Southern Pacific/Cottonbelt combination is treated as a single "company" or "corporation."

Numerous provisions make clear that the legal form in which the company uses or holds the property is largely irrelevant to whether it is the company's "property" within the ambit of the statute. "Property" may be "used or held * * * as owner, occupant, lessee, or otherwise," ORS 308.510(1), and "property having a situs in this state" may be "owned, leased, used, operated or occupied," ORS 308.505(3). The assessment applies to "all property owned, leased, rented, chartered or otherwise held for or used by [the property user] in performing a [designated] business," ORS 308.517(1). Railroad property includes land "used or held and claimed exclusively as right of way," ORS 308.510(2), and includes property "situated within its station ground reservations or rights of way," ORS 308.510(4)(c).

The company reports the length of the routes both within and without the state, including those it "controls or uses as owner, lessee or otherwise," ORS 308.525(11). When the unit rule is applied to a company which "owns, leases, operates over or uses rail, * * * operational routes or property within and without this state," the allocation to Oregon may be according to a mileage ratio:

"* * * [T]he proportion which the number of miles of rail * * * or operational routes in Oregon, controlled or used by the company, as owner, lessee, or otherwise, bears to the entire mileage of rail * * * or operational routes controlled or used by the company, as owner, lessee, or otherwise." ORS 308.550(1).

---

[12] ORS 308.505(2):

"As used in ORS 308.505 to 308.730:

"* * * * *

"(2) 'Person,' 'company,' 'corporation' or 'association' includes any person, group of persons, whether organized or unorganized, firm, joint stock company, association, cooperative or mutual organization, people's utility district, joint operating agency as defined in ORS 262.005, syndicate, copartnership or corporation engaged in performing or maintaining any business or service or in selling any commodity as enumerated in ORS 308.515 whether or not such activity is pursuant to any franchise."

If, as here, the mileage ratio would not allocate "fairly," then "the department may use any other reasonable method," ORS 308.550(2),[13] but the language of the mileage formula nevertheless indicates the broad sweep of property subject to allocation under a unit valuation. The unit rule itself refers to "property" without specifying the mode of possession, but the statute has already defined the unrestricted term "property" to embrace forms more various than simple ownership.[14]

The final stage of central assessment is apportionment of the value of property having a situs in this state to the several counties. ORS 308.525(12), 308.565, 308.635, 308.645. The counties may levy and collect taxes based on the Department's central assessment. ORS 308.635(4).

## III. APPLICATION OF THE STATUTE TO THIS CASE

This case turns on whether the Cottonbelt railroad operations are Southern Pacific's "property," as that term is defined in ORS 308.510(1) and used in the rest of the statutory scheme. By thus focusing the issue, we must exclude as irrelevant many of the criteria considered by the Tax Court.

Composition of the unit for purposes of income and franchise taxation has at best limited significance in this property tax case. Even as to property assessment, the decision of another state to assess the two lines as a unit or separately can be authority in this court only to the extent that the other state's test for composition of the unit is the same as Oregon's.

---

[13] In this case, allocation was largely done using a formula proposed by the National Association of Tax Administrators.

[14] Seeming exceptions are ORS 308.525(6), (7), (8), and (10), which require a company subject to the central assessment statute to file a statement reporting the "property *owned* by the company" (emphasis added). However, the term "owned" here stands for property "used or held * * * as owner, occupant, lessee, or otherwise," ORS 308.510(1). Because of the other broader provisions, these subsections do not relieve the company of the duty to report all its property. The Department may require "[a]ny other facts or information" beyond what is enumerated. ORS 308.525(14).

Plaintiff argues that the term "entire property" in ORS 308.555 "embraces only that property in which the taxpayer-company has a direct and legally recognized interest and that property of an affiliated corporation, to the extent not leased, licensed or contributed to the taxpayer under a legally recognizable arrangement, is not includable within the unit permitted by [the unit rule]." We reject plaintiff's argument, *supra* note 8, that "property" means "property having a situs in this state." The term "connected directly with the business" in ORS 308.555 paraphrases the requirements of ORS 308.510(1), 308.515, and 308.517, and does not impose an additional requirement.

Since a combined unit might result in a flow of tax revenues away from states where Cottonbelt operates, taxing authorities in those states have no incentive to assess the combined unit even if their property tax laws might permit them to do so. Of the five states other than Oregon where only Southern Pacific operates, California assesses the lines as a unit while the others do not. Since of all the states in which Southern Pacific operates, Oregon's position as a western terminal is closest to California's, this might seem to be some precedent for assessing the combined unit. However, neither the record nor the briefs reveal the reasons or legal basis for any other state's decision.[15] Thus the assessment decisions of other states do not help us interpret our own statute.

Separate accounting, separate regulatory reporting, and separate incorporation do not reveal the property relation between two companies, because a company that is controlled by another might maintain its own independent books, reports, and corporate form. These reports are material but not conclusive evidence of valuation. ORS 308.545. Although the report of the Interstate Commerce Commission "shall indicate the value of the property of each common carrier as a whole and separately identify the value of its property in each State * * * in which the property is located," 49 USC § 10781(b) (1980 supp), regulatory reporting has purposes not relevant to characterizing property for this scheme of ad valorem taxation. *See, United States v. Los Angeles & Salt Lake Railroad Co.*, 273 US 299, 310, 47 S Ct 413, 71 L Ed 651 (1927); *Portland Gen. Elec. Co. v. Dept. of Rev.*, 7 OTR 33, 40 (1977). The statute is clear that the form of property use is immaterial. While the separate accounting and reporting makes combined valuation more difficult, convenience of assessment is not the test of what falls in "the entire property," ORS 308.555.

An integrated enterprise can market separate financial obligations of its components, as Southern Pacific itself does for its equipment. For the same reason, separation of marketing, purchase and repair, operations, and labor show nothing about the property relation between two companies, since

---

[15] We are not told whether the property tax statutes are similar to ours, whether the choice between combined and separate assessment was explicitly contested, or whether the choice was judicially determined. In response to our question, neither party was able to cite decisions of other courts.

these separations could be drawn by delineating two divisions of a single company.

Nor is economic or geographic remoteness the test for the scope of the unit. If two lines are only remotely connected, then there may be little going-concern value to capture, but that will be reflected by a suitable valuation methodology. The Tax Court said that the Oregon operation must be so "closely related" to that of the out-of-state operations that it would be "directly affected" by, say, an out-of-state casualty. But proximity is not the test for the boundaries of the unit. The properties of Southern Pacific in Texas and Louisiana are as remote as the Cottonbelt properties there, but no one contests that all Southern Pacific's properties, however distant, are equally part of the unit. The physical connection of these two lines is irrelevant, since two railroads could compose a single unit though separated by a gap.

On the other hand, because the relevant test is the company's "property," the Department's suggested test of "operational integration" is too broad as an interpretation of this statute.[16] Operational integration is a matter of degree, while the statute requires an all-or-nothing assessment, ORS 308.510(5). Companies do not by mere contractual coordination acquire the right to control each other's operations. When Cottonbelt and Southern Pacific first began to coordinate their operations in 1930, the Cottonbelt properties did not thereby become Southern Pacific's property. Similarly, integration of marketing, financing, executive services, operations, and labor do not alone show that a company is the property of another,

---

[16] Although the Department does not define "operational integration" in its briefs, we gather that the term is supposed to mean unity of use and management, together with coordination of financial and physical operations. The test of operational integration may be appropriate in composition of the unit for income taxation. *See* OAR 150-314.615-(D).

A report on unit valuation recommends that the test for the scope of the unit be use rather than ownership. Committee on Unit Valuation of the Nat. Assoc. of Tax Admin., Appraisal of Railroad and Other Public Utility Property for Ad Valorem Tax Purposes 2-3, 18-20 (1954). The report also suggests unity of use as the test for determining whether the properties of a subsidiary rail corporation should be combined for valuation with the properties of the parent rail corporation. *Id.* at 21. However that same report endorses a test of functionally related property within the boundaries of ownership, where ownership is broadly defined to include a parent corporation and its subsidiaries. *Id.* at 3 n. 1. The recommendations of the report do not attempt to take account of the statutory definitions and schemes of the various states.

because independent companies could provide each other with any or all of these services. Moreover, even a considerable degree of operational integration shows nothing about the property connection between two companies in an industry so pervasively interconnected as railroading.

The proper test of what this statutory scheme includes depends on concepts of *property,* "real and personal, tangible and intangible, used or held * * * as owner, occupant, lessee, or otherwise." ORS 308.510(1). The term "otherwise" broadens the definition of property but, construed by the *ejusdem generis* rule, stays within this familiar arena. These concepts of property are more definite than the wavering tests of operational and economic integration. What shows a property connection between corporations is the right to control the operations of the other company. While overlap of officers is neither necessary nor sufficient to show that one company is the property of another, it is evidence of at least possessory control. Here, Southern Pacific did exert executive control on Cottonbelt's marketing, financing, management, operations and labor, and did so as owner of Cottonbelt.

Southern Pacific owns 99.7 percent of Cottonbelt. While the continued existence of a few minority stockholders does impose fiduciary duties and require separation of records, the almost total ownership gives Southern Pacific total control. Some decades ago when its stock holdings were much smaller, there would have been a problem in determining whether Southern Pacific had acquired effective control, but that line has long been crossed.

Cottonbelt's railroad operations were "used or held by [Southern Pacific] as owner, occupant, lessee, or otherwise." It is equally clear that Southern Pacific used or held Cottonbelt's operations "in the performance or maintenance of" its designated business of railroading. ORS 308.510(1).

The parties agree that Cottonbelt is not excluded from the 1977 amended definition of "property" as "intangible property that represent[s] claims on other property including * * * all shares of stock in corporations," ORS 308.510(1).[17] The

---

[17] The phrase in ORS 308.510(1), quoted in full at note 7, *supra,* was added by Or Laws 1977, ch 602, § 2, as part of an act which expanded the definition of intangible

exclusion of "shares of stock" applies only to investment securities, not to a controlling stock interest in a corporation doing designated railroad business. Because of the appraisal methods used here, the value of the Southern Pacific/

---

personal property to include information-storage media as property subject to assessment generally, *id.*, § 1, codified at ORS 307.020(1). That act excluded centrally assessed corporations from the expanded definition, and also made explicit that "intangible personal property" of the sort defined in ORS 307.020(1) is not included in the "property" of centrally assessed corporations. ORS 307.020(4). The central assessment statute has its own standard for dividing real from personal property, ORS 308.510(2), (3).

According to a representative of the Department who was a proponent of the 1977 act, it simply ratified what had been the Department's practice in central assessment "almost since day one." Tape of Senate Revenue and School Finance Committee hearing, June 7, 1977, tape 31, side 2 at 221; tape of House Revenue and School Finance Committee hearing, June 28, 1977, tape 37, side 1 at 605. He "noted the change in ORS 308.510 would make such clarification and reflect the practice of the Department of Revenue in appraising Utilities and other centrally assessed corporations." Minutes, House Comm. *on Revenue and School Finance, June 28, 1977, pp 1-2.*

The items specifically included in the original definition of "property" in ORS 308.510(1) are all ones which aid the company "in the performance or maintenance of [its] business." An item is not excluded from the amended definition simply because it is intangible, since rights of way and franchises are still listed as examples of chattels included. The examples of intangibles excluded by the amended definition are claims that are held merely for their money equivalent and could be exchanged without affecting the business of the company. A minority stock interest held for investment would be excluded because it is held merely as evidence of indebtedness.

Here, the stock of Cottonbelt was not interchangeable with the stock of any other corporation with similar fiscal character. Rather, Southern Pacific holds Cottonbelt's stock in order to gain a right to control and use Cottonbelt's "lands and buildings, rights of way, roadbed, * * * vehicles, cars, rolling stock, tracks, * * * inventories, tools, equipment, machinery, franchises and special franchises, work in progress and all [its] other goods or chattels," ORS 308.510(1). Southern Pacific's controlling interest in this connecting railroad is "used or held * * * for or in use in the performance or maintenance of" its own railroad business, ORS 308.510(1), and is "incidental" to its business, ORS 308.515(4). Southern Pacific stipulated that five California affiliates are properly within its valuation unit, and while a stipulation is not an admission, it was Southern Pacific who initiated this extension of its valuation unit, which suggests that including affiliated corporations in the unit is legitimate.

In the context of income taxation, we have not found the existence of a separate corporate shell to be a barrier to unified assessment of integrated affiliates. *Coca Cola Co. v. Dept. of Rev.,* 271 Or 517, 526-29, 533 P2d 788 (1975); *Zale-Salem, Inc. v. Tax Com.,* 237 Or 261, 391 P2d 601 (1964). If corporate boundaries marked the boundaries of the valuation unit, then the unit rule could be subverted by separate incorporation of each state's operations. Accordingly, here we assess the property of the subsidiary as property of the parent.

None of Cottonbelt's railroad property has a situs in this state. Our holding is not meant to imply the position of double taxation where two affiliated corporations have utility property with a situs in this state.

Cottonbelt unit would be the same if one corporation owned all the Southern Pacific and Cottonbelt assets directly.[18]

Thus, the properties of the subsidiary corporation, Cottonbelt, are "property" of the parent, Southern Pacific, and the two may be valued as a unit within the constraints of fairness. Where one railroad has stock control, common officers, and effective control of a separately incorporated carrier, combined valuation is recommended by modern appraisal practices[19] and is permitted by the federal constitution.[20] We have noted that any allocation which satisfies the statutory requirement of fairness thereby satisfies the federal constitution. Plaintiff argues that the larger valuation unit would result in a massive shift of revenues to Oregon that would distort the allocation unfairly and hence unconstitutionally.[21] The direction that revenues would be shifted is irrelevant; our reasoning would have to be the same if the values were reversed. However,

---

[18] No increment of value is attributable to Southern Pacific's investment stock. Income from intangible evidences of indebtedness are separately stated in ICC accounts and are not included in the income, stock, and debt measures of value used here.

[19]

"While control over the operation of one railroad by another does not preclude separate appraisal of each carrier, the existence of such control sometimes creates a situation where separate appraisal is undesirable. Very often ownership of a controlling interest in railroad *A* is worth something more to *B* than the simple right to share in the distribution of *A's* earnings. *B* may do business with *A* that would be lost if control passed into other hands, or if not lost, continued on terms less favorable than those secured by virtue of control. *B's* earnings may, therefore, be higher and *A's* perhaps would be less than they would be if the control relationship did not exist. Use of either the income capitalization method of valuation or the stock and debt method might thus result in a higher valuation for *B* and a lower one for *A* than that which would exist if *A* and *B* were completely separate railroad entities. Where the assessor finds this to be the case, with evidence of a serious distortion of values, a combination of railroads *A* and *B* into a single appraisal unit might offer a satisfactory solution." Committee on Unit Valuation, *supra* n 16, at 21-22.

The Staggers Rail Act of 1980 created a board to establish cost accounting principles for railroads. 49 USC § 11161 to 11168 (1980 supp).

[20] *Southern Railway Co. v. Kentucky,* 274 US 76, 79, 47 S Ct 542, 71 L Ed 934 (1927); *Cleveland C.C. & St. L. R. Co. v. Backus, supra* n 10.

[21] According to Southern Pacific, including Cottonbelt in the valuation unit without changing the formulae for valuation and allocation would increase the value allocated to Oregon by $13 to $17 million for each of the years in issue, an increase of 27 percent to 38 percent. The Department counters that this increase is only 1.7 percent to 2.2 percent of the nationwide system value of the combined unit, which ranged from $689 million to $815 million.

the massiveness of the shift is some cause for concern, given that Cottonbelt is much smaller and less valuable than Southern Pacific by every measure except income. *See supra* note 2.

Such disproportion suggests that the allocation formula, applied to the combined unit, may yield "a grossly distorted result," *Norfolk & Western Railway Co., supra* note 11, 390 US at 326, 329. The allocation formula must reflect "the peculiarities of a given enterprise," *Id.,* 390 US at 325. Even if a combined unit for valuation is proper, the allocation formula must fairly reflect the contribution of each state's component in order to satisfy the federal constitution. In this appeal — unlike *Burlington Northern v. Dept. of Rev.,* 291 Or 729, 635 P2d 347 (1981), and *Pacific Power & Light Co. v. Dept. of Revenue,* 286 Or 529, 596 P2d 912 (1979) — the valuation and allocation formulae are not before us. Nevertheless, we must ensure that the statutory and constitutional requirement of fairness is met.

Here the Tax Court carefully tailored the methods for valuation and allocation to the character of the enterprise included in the unit. The weight assigned each element in the allocation reflected the proportional operating expenses associated with that element. To reverse the finding of the valuation unit while leaving the rest of the judgment untouched might introduce unfairness, because the three findings are interconnected. Although Southern Pacific did not cross-appeal, on remand the Tax Court shall consider whether the valuation and allocation formulae should be adjusted.

Reversed and remanded to Oregon Tax Court.