Argued February 1, 1967, affirmed in part, reversed in part and remanded February 28, 1968

PORTLAND GENERAL ELECTRIC COM-PANY, *Respondent and Cross-Appellant, v.* STATE TAX COMMISSION, *Appel-lant and Cross-Respondent.*

437 P. 2d 827

*Alfred B. Thomas,* Assistant Attorney General, Salem, argued the cause for appellant and cross-respondent. With him on the briefs were Robert Y. Thornton, Attorney General, and Gerald F. Bartz, Assistant Attorney General, Salem.

*Alfred H. Stoloff,* Portland, argued the cause for respondent and cross-appellant. With him on the briefs were Phillips, Coughlin, Buell & Phillips, Portland.

Before PERRY, Chief Justice, and McALLISTER,

SLOAN, O'CONNELL, GOODWIN, DENECKE and LUSK, Justices.

McALLISTER, J.

These cases involve the valuation for ad valorem tax purposes of certain property used by the plaintiff, Portland General Electric Company, as a part of its Pelton-Round Butte Hydro-electric Project in Jefferson county. The State Tax Commission assessed PGE's interest in the property and PGE being dissatisfied appealed to the Oregon Tax Court. The tax court reduced the valuations fixed by the commission, and the commission has appealed to this court and PGE has cross-appealed. The first case, 2 OTR 222 (1965), involves the 1964 tax year, and the second case, 2 OTR 356 (1966), involves the 1965 tax year. We will first consider the 1964 tax year and thereafter dispose of the separate issues involved in the 1965 tax year.

## THE 1964 TAX YEAR

The facts were stipulated except as to the opinion evidence concerning valuation. PGE is an investor-owned public utility engaged in the generation, transmission, distribution and sale of electrical energy. Its property is assessed for ad valorem tax purposes by the commission pursuant to ORS 308.505 to 308.730.

The Pelton-Round Butte Project was constructed by PGE pursuant to a license issued by the Federal Power Commission in 1951 for the Pelton Project, and amended in 1961 to include the Round Butte Project.[1]

---

[1] Federal Power Comm'n v. State of Oregon, 349 US 435, 75 S Ct 832, 99 LEd 1215 (1955).

The license granted to PGE by the FPC was for a term of 50 years, of which 37 years were remaining on January 1, 1964.

The Pelton Project was completed and in operation before January 1, 1964. The Round-Butte Project was completed later. The entire Pelton-Round Butte Project included the Pelton Dam, the Round Butte Dam, a reregulating dam downstream from the Pelton Dam, a reservoir behind each dam, and powerhouses, generating facilities, fish facilities, transmission lines, roads and recreational facilities. The three dams impounded water in the canyons of the Deschutes, Metolius and Crooked Rivers.

The portion of the Pelton-Round Butte Project lying west of the center of the Deschutes River and north of the center of the Metolius River occupies lands on the Warm Springs Indian Reservation which have been permanently reserved by the United States for power purposes.[2] The portion of the project which lies east of the center of the Deschutes River and south of the center of the Metolius River occupies lands of the United States which also have been permanently reserved for power purposes.[8]

PGE was required by the FPC to secure from the Confederated Tribes of the Warm Springs Reservation of Oregon the rights to the use of certain lands on the Warm Springs Indian Reservation.[9] Under their agreement with PGE the Warm Springs Indians granted to PGE easements "for the use of tribal lands upon which the westerly ends of the Pelton Dam, the reregulating dam and the Round Butte Dam would be

[2] Id. at 438-9 n. 5, 75 S Ct at 835 n. 5, 99 LEd at 1221 n. 5.

[8] Id. at 439 n. 6, 75 S Ct at 835 n. 6, 99 LEd at 1221 n. 6.

[9] The Warm Springs Indian Reservation was established by the Treaty of June 25, 1855, between the United States and the Tribes in Middle Oregon.

situated, respectively, together with easements to place powerhouses, transmission lines, substations and other equipment necessary or useful in the generation, transmission and distribution of electric energy, access roads in connection with said projects, and to provide for flowage easements over and upon all tribal lands owned by the Warm Springs Indians which would be inundated by the construction and operation of said power projects or any structures or facilities in connection therewith."

The flowage easements granted to PGE included:

(a) The right to the use of tribal lands on the westerly side of the Deschutes River for the purpose of a reservoir behind the Pelton Dam, and the right to flood said lands up to an approximate elevation of 1585 feet above mean sea level;

(b) The right to the use of tribal lands on the westerly side of the Deschutes River for the purpose of a reservoir behind the reregulating dam in connection with the Pelton Project, and the right to flood said lands up to an approximate elevation of 1440 feet above mean sea level;

(c) The right to the use of tribal lands on the westerly side of the Deschutes River and westerly and northerly banks of the Metolius River, for purposes of a reservoir not exceeding 1950 feet above mean sea level behind the Round Butte Dam.

In consideration for all of the easements and rights granted to it by the Warm Springs Indians, PGE agreed to pay the Warm Springs Indians monthly sums based upon the nameplate capacity in kilowatts of the generation facilities at the Round Butte and Pelton dams and, in addition, an amount equivalent to one-tenth of one mill ($0.0001) per kilowatt-hour produced by the main generators at the two powerhouses. PGE agreed to pay also a monthly rental of

five cents per acre for the rights of way for transmission lines and for roads used in connection with the operation and maintenance of said transmission lines. It appears that PGE will pay to the Warm Springs Indians under their agreement about $310,000 to $330,000 per year exclusive of the payments for transmission line rights of way.

Prior to the construction of the Round Butte Project, Pacific Power and Light Company and the Bureau of Reclamation owned and operated the Cove Hydroelectric Project upstream from Round Butte. Because the Round Butte Project would inundate the Cove Project, the Federal Power Commission required PGE to indemnify Pacific and the Bureau for the loss of power from the Cove Project. PGE agreed to supply Pacific and the Bureau with power equivalent to the power they would lose for the estimated remaining life of the Cove Project. Pacific in turn agreed to pay PGE an amount representing the operating and maintenance expenses of the Cove Project assuming it had continued to exist. PGE paid Pacific $132,000 to reimburse it for relocating its transmission and other facilities. The land under the Cove Project was conveyed to PGE, and the Cove Project was destroyed by inundation prior to January 1, 1964.

The commission assessed PGE's interest in the Cove Project at a value of $369,000, representing the present worth of the power to be delivered annually by PGE for the remaining life of the Cove Project. The parties have agreed that if an additional assessment is proper, its value for 1964 is $369,000.

In the court below the parties stipulated that the issues to be determined were:

"(a) Whether or not lands of the United States and Tribal lands of the Warm Springs Indian Res-

ervation within the Pelton-Round Butte Hydro-electric Project are taxable by the State of Oregon.

"(b) If the Court should hold that such lands are taxable, what the true cash value thereof was on January 1, 1964.

"(c) Whether or not the Cove Hydro-electric Project, which was destroyed before January 1, 1964, by inundation is taxable by the State of Oregon. * * *"

The right of the State of Oregon to levy an ad valorem tax on PGE's interest in the lands of the United States, including the tribal lands, is no longer open to question. As to the lands of the United States, the question was settled with finality by the following trilogy of cases: *United States v. City of Detroit,* 355 US 466, 78 S Ct 474, 2 LEd2d 424 (1958); *United States v. Township of Muskegon,* 355 US 484, 78 S Ct 483, 2 LEd2d 436 (1958); *City of Detroit v. Murray Corp.,* 355 US 489, 78 S Ct 458, 486, 2 LEd2d 441, 460 (1958), reh. denied, 357 US 913, 78 S Ct 1145, 2 LEd2d 1164. We embraced and applied the rationale of those cases in *Sproul v. Gilbert,* 226 Or 392, 420, 359 P2d 543, 556 (1961). That the same rule of taxability applies to tribal lands was settled by *Oklahoma Tax Comm'n v. Texas Co.,* 336 US 342, 69 S Ct 561, 93 LEd 721 (1949), reh. denied 336 US 958, 69 S Ct 887, 93 LEd 1111.

■ PGE relies heavily on *Warren Trading Post v. Arizona Tax Comm'n,* 380 US 685, 85 S Ct 1242, 14 LEd2d 165 (1965), in support of its contention that its interest in both the lands of the United States and the tribal lands is immune from taxation. That case, however, is simply not apposite. It held that Arizona could not impose a tax on the gross income of a company operating a trading post on a Navajo Indian Reserva-

tion under a license granted by the Commissioner of Indian Affairs. Arizona's right to impose a tax was denied because "Congress has taken the business of Indian trading on reservations so fully in hand that no room remains for state laws imposing additional burdens upon traders." (14 LEd2d at 168). The facts in the *Warren Trading Post* case have no similarity to the facts in the case at bar. We hold that the state may impose an ad valorem tax on the interest of PGE in both the lands of the United States and the tribal lands.

The real dispute in this case is over the valuation of PGE's interest in the tribal lands. Up to the trial of this case in the court below no charge had been made to PGE for the use of any of the lands of the United States in connection with the Pelton-Round Butte Project. The commission assessed PGE's interest in the United States lands at a value of $10 per acre, and PGE has not objected to that valuation. The court below, pursuant to a stipulation of the parties, assessed the rights of way for transmission lines at $2 per acre, and there is no dispute in this case over that valuation. We are only concerned with the true cash value of PGE's interest in the tribal lands.

The commission assessed PGE's interest in the tribal lands by capitalizing the probable future average annual payments by PGE to the Warm Springs Indians for the use of said lands. This resulted in a valuation of about $2,483 per acre for approximately 552 acres flooded by the Pelton Dam, and about $3,933 per acre for about 888 acres flooded by the Round Butte Dam. The commission contends that the highest and best use of the property is for a power site and that it should be so valued. It further contends that its method of valuation by capitalizing the probable

future average annual payments for the use of the property is an acceptable method of valuing property which has no market value.

In its complaint by which PGE initiated its appeal to the tax court, ORS 306.545, it conceded that the true cash value of its right to overflow the tribal lands was "no more than $150 per acre."[9] In the tax court PGE offered opinion evidence tending to prove that the highest and best use of the tribal land was for grazing and recreational purposes, and that its value did not exceed $150 per acre.

The court below fixed the value of PGE's interest in the tribal lands at $10 per acre. This value was based on the premise that there was no material difference between the United States lands on the one side of the river and the tribal lands on the other side. The court said: "[I]t is difficult to subscribe to the theory that PGE's interest on one side is worth $10 per acre and its interest on the other side is worth $2500 to $4000 per acre for the same kind of land, especially when the benefits to PGE are the same." It is undisputed that the land on both sides of the river is substantially the same—rough, rocky and steep.[10]

---

[9] Plaintiff's complaint alleges as follows:

"F. The true cash value of PGE's right to overflow the Indian lands is no more than $150 per acre, and the true cash value of its use of U. S. and Indian lands for transmission line rights of way is no more than $2 per acre."

[10] "This court spent one day viewing the property involved and travelled approximately forty miles by boat over both lakes and another forty miles by jeep. The canyons, partially filled by the two lakes, are typical central Oregon canyons. Generally they are deep, rocky and almost perpendicular in many areas. There are some places where the slope to the water is more gradual but this is the exception. The federal lands on one side and the tribal lands on the other side of the lakes are the same except that the tribal lands might be classed as more rugged and precipitous than the federal lands." 2 OTR at 232-3.

In this court PGE concedes that for its purpose the highest and best use of the land on both sides of the river is for a power site, i.e., hydroelectric project. This concession eliminates one of the questions before the trial court and simplifies the issues before us. We agree that the highest and best use of the land is for a hydroelectric project, and that it must be valued on that basis.

■ We also hold that, except for the transmission line rights of way, the rights granted to PGE by the Warm Springs Indians must be valued as a unit. We think the trial court erred in valuing the flowage easements separately from the property to which they are appurtenant.[7] PGE's agreement required it to make monthly payments to the Warm Springs Indians, not just for the flowage easements, but for all the rights granted to PGE for the use of tribal lands. Those rights are listed earlier in this opinion.

The authority of the commission to assess the property of PGE and other utilities is derived from ORS 308.505 to 308.730.[8] Property is defined in ORS 308.510 (1)[9] to include "all property, real and per-

---

[7] "The issue in this case involves the valuation of PGE's interest in the inundated Indian lands. It does not include all the other Indian lands involved in the entire hydroelectric project. * * * It is this court's conclusion that the value of PGE's interest in the dam site is another matter not at issue in this case. * * *" 2 OTR at 234

[8] In the tax court the commission relied solely on its general authority to tax utilities granted by ORS 308.505 to 308.730. In its reply brief in this court the commission argued for the first time that ORS 307.060 justified the valuation placed by it on the tribal land. Since that statute was not relied on in the tax court, the issue of its applicability to this case is not before us and we express no opinion with regard thereto.

[9] ORS 308.510 "(1) 'Property,' as used in ORS 308.505 to 308.730, includes all property, real and personal, tangible and intangible, used or held by a company as owner, occupant, lessee,

sonal, tangible and intangible, used or held by a company as owner, occupant, lessee, or otherwise, for or in use in the performance or maintenance of a business or service or in a sale of any commodity, * * *." This statutory definition of property includes rights to the use of property of the kind created by PGE's agreement with the Warm Springs Indians. It is, therefore, unnecessary to describe with precision the nature of PGE's rights in the tribal lands. As to the lands on which the dams, powerhouses, substations and similar structures were erected, PGE obviously has a possessory interest. As to the flowage and other easements, PGE's interest would seem to be non-possessory. The question of the nature of these rights was not raised in the tax court and we think is not controlling here. It is also unnecessary to decide whether the flowage easements are appurtenant to the land on which the dams are situated, or to some other interest. In any event, we agree with the commission that PGE's interest in the tribal lands, except the transmission line rights of way, must be assessed as an entity.[10]

---

or otherwise, for or in use in the performance or maintenance of a business or service or in a sale of any commodity, as set forth in ORS 308.515, whether or not such activity is pursuant to any franchise, and includes but is not limited to the lands and buildings, rights of way, roadbed, water powers, vehicles, cars, rolling stock, tracks, wagons, horses, office furniture, telegraph, telephone and transmission lines, poles, wires, conduits, switchboards, machinery, appliances, appurtenances, docks, watercraft irrespective of the place of registry or enrollment, merchandise, inventories, tools, equipment, machinery, franchises and special franchises, work in progress and all other goods or chattels."

[10] The consideration for the rights of way for transmission lines and roads used in connection therewith was stated separately in PGE's agreement with the Warm Springs Indians. The consideration for all other easements granted by said agreement was unsegregated.

■ PGE's interest in the tribal lands is to be assessed at its true cash value, which is defined by ORS 308.205[20] as "market value as of the assessment date." In the case of property which has no market value, the true cash value must be determined by some other method of appraisal. The capitalization of income is a commonly used method of appraisal and its use under proper circumstances has met with general approval.[21]

In this case, the payments made by PGE to the Warm Springs Indians are directly and solely attributable to the use of the tribal property. The agreement between PGE and the Warm Springs Indians for the use of the property recites "that the compensation to be paid to the Warm Springs Indians for the easements as of the date of this Amendment[22] is fair and equitable." In addition, PGE's vice president who negotiated the agreement testified in the tax court that the amounts PGE was required to pay under the agreement were reasonable. There is no evidence to the contrary. There is no question about the stability of the expected future payments.

■ The commission determined the true cash value of PGE's interest by computing the present worth of PGE's estimated future payments for the remaining 37 years of the FPC license. PGE does not challenge

[20] ORS 308.205 "True cash value of all property, real and personal, means market value as of the assessment date. True cash value in all cases shall be determined by methods and procedures in accordance with rules and regulations promulgated by the State Tax Commission. With respect to property which has no immediate market value, its true cash value shall be the amount of money that would justly compensate the owner for loss of the property."

[21] Ore. Portland Cement Co. v. Tax Com., 230 Or 389, 394, 369 P2d 765, 768 (1962); Babcock, The Valuation of Real Estate, ch 12 (1st ed 1932); 1 Bonbright, The Valuation of Property, ch XI (1st ed 1937).

[22] The original agreement was amended in February, 1961, to include the Round Butte Project.

the accuracy of the commission's computation. Since PGE's payments to the Warm Springs Indians were reasonable and attributable solely to the use of the property, the commission's method in valuing PGE's right to the use of the property was proper and should have been applied in the tax court.

PGE objects to the method used by the commission in valuing its property on two principal grounds. It argues that the commission may not assign a value for tax purposes "to something in which the utility has no investment and no earning power and which has no compensable value upon sale or condemnation." PGE further argues that the value of property may not "be found by capitalizing future annual expense which it is estimated will be paid for its use." These arguments are based on a misconception of the nature of the interest being valued in this case.

■ Although PGE's interest in the tribal lands is denominated an easement, and for a large part is a non-possessory interest, we think the rules for the valuation of possessory interests in real property are fully applicable. We find no distinction of substance between PGE's right to use the tribal lands and the rights usually enjoyed by a lessee of property from a tax-exempt owner.

■ The value for ad valorem tax purposes of the interest of a lessee in leased property is the value of the property rights owned by him as distinguished from the amount of his equity in his estate. The rent which the lessee pays is the purchase price of his property rights, in other words, his possessory estate. *Texas Company v. County of Los Angeles*, 52 Cal2d 55, 338 P2d 440, 443 (1959); Oscar C. Brothers, *Appraisal of Possessory Interests* (1st ed 1954).

Viewed in this light, the payments which PGE is

obligated to pay under its agreement represent the purchase price of its interest in the tribal lands. The payment of its purchase price in installments over the life of its license does not change the nature of the payments. It follows that PGE's interest in the tribal lands must be valued without regard to how much or how little has been paid on the purchase price. In this regard a lessee's interest is similar to the interest of a vendee under a land sale contract and the interest of a mortgagee in the mortgaged premises. In all cases the property is valued without regard to the equity in the property of the lessee, the vendee, or the mortgagee.

PGE confuses the value of its right to use the tribal lands with its equity in its interest in said lands. PGE could acquire an equity in its right to the use of the tribal lands if it prepaid the annual charges therefor, or if the market value of its right to use the tribal property should exceed the payments required therefor. *Texas Company v. County of Los Angeles,* supra, 338 P2d at 443. Because PGE has no equity in its agreement for the use of tribal lands, it has no investment therein and would have no compensable value upon sale or condemnation.

The principles enunciated in *Texas Company v. County of Los Angeles,* supra, were also applied by the Supreme Court of California in the following cases: *De Luz Homes v. County of San Diego,* 45 Cal2d 546, 290 P2d 544 (1955); *Fairfield Gardens v. County of Solano,* 45 Cal2d 575, 290 P2d 562 (1955); *Victor Valley Hous. Corp. v. County of San Bernardino,* 45 Cal2d 580, 290 P2d 565 (1955); *El Toro Development Co. v. County of Orange,* 45 Cal2d 586, 290 P2d 569 (1955). As pointed out in the foregoing authorities, possessory interests for which there is no market value

are generally valued by capitalizing the "expected future actual net income" paid for their use.

Although we approve the method used by the commission in valuing PGE's interest in the tribal lands, the case must be remanded for redetermination of the estimated payments by PGE in 1964 for the Pelton-Round Butte Project. The commission used $310,000 as the estimated annual payment for the Round Butte Project and $93,000 as the estimated payment for the Pelton Project. PGE's witness testified that its estimated annual payment for both projects combined would total between $310,000 and $330,000 annually. A witness for the commission testified that the commission had understood that the $310,000 represented the estimated payment for the Round Butte Project only, and if this understanding was in error, its appraisal should be adjusted. It appears from the record that this question was not settled, and the case is remanded to the tax court for that purpose.

It appears that the court also erred in striking in its entirety the commission's valuation of the Cove Project. Pursuant to its contract with Pacific, PGE acquired title to the Cove Project site comprising about 29.50 acres of land which is now flooded by the waters of the Crooked River and is being used by PGE as an integral part of its Round Butte Project. The parties stipulated in part that "[e]xcept as set forth in Exhibit 3, the Cove Hydro-electric Project is not included in the tax base of the plaintiff." There is a sharp dispute in the briefs as to the meaning of this stipulation and as to whether this land was included in the unit or system value of PGE's property. We are unable from the record before us to decide these disputed questions and must remand them to the tax

court for further consideration. The land must be assessed to PGE at its true cash value, but we express no opinion as to how that value should be determined.

In its cross-appeal PGE raises two issues, one of which, the taxability by the state of PGE's interest in the tribal lands and the lands of the United States, has been disposed of earlier in this opinion.

PGE also contends that the value of its interest in both the United States and the tribal lands had already been taken into account by the commission in the determination of PGE's "system" value. The latter issue was not raised in the tax court by PGE's complaint, or otherwise, and was not even mentioned in the stipulation designating the issues to be tried in the court below. In addition, there is no evidence in the record from which the question could be decided if it were before us. The commission contends that it valued all of PGE's property except the property interests involved in this case, and then added to that valuation the separately appraised value of the property interests involved in this proceeding. There is no evidence to the contrary. There is no substance to the cross-appeal.

The case is remanded to the tax court for further proceedings not inconsistent herewith.

## THE 1965 TAX YEAR

■ In 1965 the commission increased its appraisal of PGE's interest in the United States lands from $10 per acre to $60 per acre. The tax court reduced this value to $10 per acre, and we think was in error in so doing. The commission's reason for increasing the value of PGE's interest in the United States lands from $10 to $60 does not clearly appear from the rec-

ord.[19] The reason assigned for the increase by the commission is not controlling. One of PGE's expert witnesses testified that the fee value of the tribal lands across the river from the United States lands was $150 per acre. Another PGE expert witness testified that the true cash value of the tribal lands allotted to the Jacksons, referred to later in this opinion, was $500 per acre. It further appears from the record that PGE purchased about 313.75 acres of deeded lands for the Round Butte project at an average cost of $1,060 per acre. It also purchased flowage and other easements on 998.99 acres for the Round Butte Project at an average cost of $278 per acre. In view of this evidence we cannot take seriously PGE's contention that its right to the use of the United States lands is not worth $60 per acre. The commission's 1965 valuation of PGE's interest in the United States lands at $60 per acre is reinstated.

In addition to increasing the value of PGE's in-

---

[19] "The defendant now contends that PGE's interest in the lands of the United States under the FPC license has a true cash value of $60 per acre as of January 1, 1965, as compared to the $10 per acre assigned by the defendant for the prior year. While the defendant's appraiser testified that some investigation of purchases by PGE of fee or lesser interests in the area justified the raise from the $10 true cash value in 1964 to the $60 used in 1965, the increase appeared to be based upon information from the Federal Power Commission concerning annual charges to Oregon licensees. The latter commission in response to an inquiry from the defendant, stated that a $60 per acre value had been assigned to projects under FPC licenses in Oregon. This was based on an annual charge of $2.40 per acre rental for the lands involved under the FPC license. However, the letter also stated that no annual charges had been determined for the Pelton and Round Butte projects. It is conceded by the parties that PGE has not paid any annual charges to the federal government for its interest in the federal lands under the FPC license. There appears to be no valid reason why the $10 per acre true cash value assigned by the defendant to PGE's interest in the federal lands for 1964 should be changed for 1965." 2 OTR at 357.

terest in the United States lands, the commission assessed at large against the Pelton-Round Butte Project a value which it attributed to "U. S. dam site." This value was computed at the rate of five cents for each kilowatt-hour of estimated production of the two dams. This item was stricken by the tax court, and we think properly so. We have pointed out earlier in this opinion that PGE's interest in the tribal lands must be assessed at its true cash value. PGE's interest in the United States lands also must be assessed at its true cash value. The interest to be assessed, however, is PGE's interest in the lands, and not some intangible benefit described merely as "dam site." Since PGE now concedes "that the highest and best use of the lands on both sides of the river (certainly as far as PGE is concerned) is for a power site," this dispute over dam site value loses its significance. That portion of the tax court's decree striking the value assigned to "U. S. dam site" is affirmed.

The 1965 case includes a dispute over the value of PGE's interest in tribal lands allotted to Charles and Georgiana Jackson, on which the west terminus of the reregulating dam and its associated reservoir is located. The Jacksons granted PGE easements over their allotted land for the construction of the dam and reservoir, for flowage and for access roads. PGE agreed to pay the Jacksons for these easements the sum of $500 per month. The commission valued PGE's interest in the Jackson lands at $87,720, which represents the present worth of $500 per month for the remaining term of the FPC license. The tax court erroneously reduced this value to the equivalent of $100 per acre. For the reasons set out earlier in this opinion, the commission properly valued PGE's interest in the Jackson lands by capitalizing PGE's expected fu-

ture annual payments for the use of this property. That portion of the tax court decree which reduced the commission's valuation of PGE's interest in the Jackson lands is reversed and the value assessed by the commission is reinstated.

In 1965 the commission also increased the value of the rights of way for transmission lines to $10 per acre by capitalizing the monthly rental of five cents per acre paid therefor by PGE pursuant to its agreement with the Warm Springs Indians. This valuation also was reduced by the tax court to the $2 per acre value which had been stipulated in 1964.[9] The commission's computation of the capitalized value is not challenged. For the reasons heretofore stated, this portion of the tax court's decree is reversed and the commission's valuation of this item is reinstated.

The valuation of PGE's interest in the tribal lands, and the taxability of the Cove Project were again raised in the 1965 case. These issues are controlled by our decision in the 1964 case. That part of the decree in the 1965 case reducing the value of PGE's interest in the tribal lands is reversed and the commission's valuation of that item is reinstated. That part of the decree again holding that the inundated Cove Project is not taxable is reversed and remanded for further proceedings not inconsistent herewith.

---

[9] "In the prior case the parties stipulated to a true cash value of $2.00 per acre for PGE's interest in an easement for the operation of power transmission lines over the Indian lands. The defendant now contends that PGE's interest should be valued at $10 per acre, based on a capitalization of payments to the Indians. The plaintiff's appraiser testified to a value of $2.00 per acre based on the difference between the value of the fee land without the easement and the value of the fee land with the restrictions contained in the easement. The true cash value of PGE's interest in the easement is set as $2.00 per acre." 2 OTR at 361.

The 1965 case is remanded to the tax court for further proceedings not inconsistent herewith.

Costs and disbursements are allowed to the defendant in both cases.