Argued and submitted May 4, 2005, decision of Tax Court affirmed March 16, 2006

# PACIFICORP POWER MARKETING, INC.,
*Appellant,*

*v.*

# DEPARTMENT OF REVENUE,
*Respondent.*

## (TC 4592; SC S51403)

131 P3d 725

James N. Westwood, of Stoel Rives LLP, Portland, argued the cause for appellant. With him on the briefs was David L. Canary, of Garvey Schubert Barer, Portland.

Marilyn J. Harbur, Assistant Attorney General, Salem, argued the cause for respondent. With her on the briefs were Hardy Myers, Attorney General, and Melisse S. Cunningham, Assistant Attorney General.

Before Carson,** Chief Justice, and Gillette, Durham, Riggs, De Muniz,*** Balmer, and Kistler, Justices.

---

** Chief Justice when case was argued.

*** Chief Justice when decision was rendered.

CARSON, J.

## CARSON, J.

 In this property tax case, we are called upon to decide whether appellant, PacifiCorp Power Marketing, Inc. (PPM),[1] is subject to ad valorem taxation by the Department of Revenue (department) based upon its contract rights relating to a municipally owned electricity cogeneration facility (facility). The department assessed the facility and taxed PPM for the 2002-03 tax year, pursuant to ORS 308.505 to 308.665 (2001) (central assessment statutes), after determining that PPM had "used" the facility, for purposes of those statutes, through its various contracts with the City of Klamath Falls (the city).[2] PPM challenged the assessment in the Oregon Tax Court, where both parties moved for summary judgment. The Tax Court granted the department's motion and denied PPM's motion, concluding that the applicable central assessment statutes, set out below, allowed the department to assess PPM's contract rights in the facility as intangible property. *Pacificorp Power Marketing v. Dept. of Rev.*, 17 OTR 334 (2004). Taxpayer appealed to this court pursuant to ORS 305.445. For the reasons set forth below, we affirm the Tax Court's decision, but upon grounds different from those relied on by the Tax Court.

We take the following undisputed facts from the record. In 1985, the city, a tax-exempt municipal corporation, first issued revenue bonds for the purpose of building a hydroelectric facility. In the mid-1990s, after an unsuccessful attempt to form a partnership with another energy company, the city endeavored to construct a gas-fired electricity cogeneration facility. Toward that end, the city entered into two contracts with Pacific Klamath Energy, Inc. (PKE), an affiliate of PPM.[3] Pursuant to the first contract, PKE oversaw the

---

[1] In 2003, PacifiCorp Power Marketing, Inc. changed its name to PPM Energy, Inc.

[2] The central assessment statutes "impose[ ] standards and procedures for assessing the ad valorem property tax of designated public utilities." *Southern Pacific Transp. Co. v. Dept. of Rev.*, 295 Or 47, 52, 664 P2d 401 (1983). The statutes require those utilities to be "centrally assessed, *i.e.*, assessed by the Department rather than by the counties." *Id.* at 53.

[3] During the tax year at issue, PKE and PPM were wholly owned subsidiaries of PacifiCorp Holdings, Inc.

construction of the facility. The second contract provided that PKE would operate and maintain the facility following its construction. Construction of the facility began in 1999, after the city issued lien bonds to fund it. The city also signed two contracts with PacifiCorp Group Holdings Company (PacifiCorp Group), PPM's then-parent: a guarantee agreement for the lien bonds and a credit facility agreement.[4]

At around the same time, the city also entered into four separate contracts with PPM: (1) a management contract; (2) a power-purchase contract; (3) a power-brokerage contract; and (4) a fuel supply and services contract. Under the management contract, PPM managed the facility as an independent contractor for a renewable term of 20 years. PPM also performed administrative work for the city, including preparation of the facility's annual budget. PPM received a management fee from the city, and the city received the profits earned by the facility, if any. PPM also received a "Management Performance Incentive" for "achieving certain performance levels."

The power-purchase contract required PPM to take or pay for 237.7 megawatts (MW), which was approximately 47 percent of the facility's output of electric power and energy. The term of the power-purchase agreement was 30 years. In exchange for the percentage of purchased power, PPM agreed to pay certain fees to the city, including a "monthly demand charge," which was PPM's allocation of the capital and interest due on the revenue bonds used to construct the facility.

Under the power-brokerage contract, PPM brokered the sale of the remaining 53 percent of the facility's power. PPM could not purchase any of the brokered power. The city paid PPM a fixed monthly brokering fee, plus an incentive bonus. PPM distributed all revenues from PPM-brokered sales to the city.

Finally, under the fuel supply and services contract, PPM provided the fuel to be burned in the facility's turbines.

---

[4] PacifiCorp Group, at that time, was also a parent of PKE indirectly. PacifiCorp Group owned Pacific Generation, the parent of PKE. Both PPM and PKE are now subsidiaries of PacifiCorp Holdings, Inc.

The city paid PPM a "fuel management fee" and monthly charges for the fuel supply. If PPM failed to supply the amount of fuel required, the city could obtain it elsewhere.

Based upon the above-described contracts between the city and PPM, PKE, and PacifiCorp Group, the department imposed a property tax on PPM for the 2002-03 tax year. The department asserted its authority under the central assessment statutes, ORS 308.505 to 308.665 (2001), and taxed PPM based upon its "use" of the facility. The department determined PPM's assessable interest to be 47 percent of the cost of the construction of the facility. That percentage corresponds to the allocation to PPM of the cost of the facility and to the percentage of the facility's power purchased by PPM, as set out in PPM's power-purchase contract with the city.[5]

PPM appealed the department's assessment to the Tax Court, challenging the department's conclusion that it had any taxable interest in the facility. PPM argued that its contracts with the city did not bestow any ownership, use, or possessory interests in the facility. PPM also challenged the department's attempt to include PKE's and PacifiCorp Group's separate contracts with the city as PPM's property. Additionally, PPM claimed that the department's assessment violated the constitutional requirements of uniformity and equalization in taxation under Article I, section 1, and Article IX, section 1, of the Oregon Constitution, because the department had taxed none of the three other purchasers of the facility's electricity.[6] PPM did not challenge either the amount of the assessment or the department's method of valuation.

The parties filed cross-motions for summary judgment. The Tax Court granted the department's motion and denied PPM's motion. *Pacificorp Power Marketing*, 17 OTR

---

[5] In its opinion and order, the department identified PKE as a wholly owned subsidiary of PPM and, on that basis, included the contracts signed between the city and PKE in its assessment. The record shows, however, and the department does not dispute, that, although PPM and PKE are affiliates with a common parent, they do not themselves have a parent-subsidiary relationship with each other.

[6] During the tax year in question, the city also had power-purchase agreements with the following entities: Seattle City Light, Modesto Irrigation District, and Sacramento Municipal Utility District.

at 347. The Tax Court defined the central legal question as follows: Does PPM "own, hold, or otherwise use some property, whether real or personal, tangible or intangible, so as to be assessable under the central assessment statutes," or does PPM hold the facility under a lease or other interest less than a fee simple, so as to be assessable under ORS 307.110?[7] *Id.* at 337 (footnote omitted).

Although the department had imposed an ad valorem tax on PPM based upon PPM's alleged use of the facility, the Tax Court concluded that PPM's rights in the "constellation of contracts" themselves, apart from PPM's alleged use of the facility, were intangible property rights that were taxable under the central assessment statutes. *Id.* at 340-41. The Tax Court reasoned as follows: (1) under the central assessment statutes, intangible property can be assessed and taxed to the "user" of that intangible property in and of itself, apart from any tangible personal or real property; (2) the use of the contract rights as intangible property is the "use" that is to be assessed and taxed, not the use of the facility itself; (3) intangible contract rights themselves are taxable when used in a centrally assessed business, regardless of whether those contract rights create any possessory interest in the facility; and (4) the intangible property need not be connected to any "unit" of tangible personal or real property. *Id.* at 339-45. Because the Tax Court concluded that the central assessment statutes allowed the department to tax PPM as a user of its intangible *contract rights*, the Tax Court did not address whether PPM could be taxed as a user of the *facility* under the central assessment statutes. Neither did the Tax Court address whether PPM held a taxable interest in the facility under ORS 307.110 (2001). *Id.* at 340-41. The Tax Court also rejected PPM's claim that the department had violated the constitutional requirements of uniformity and equalization by taxing PPM's contract rights but not

---

[7] ORS 307.110(1) provides, in part:

"[A]ll real and personal property of * * * any county or city, town or other municipal corporation or political subdivision of this state, held under a lease or other interest or estate less than a fee simple, by any person whose real property, if any, is taxable * * * shall be subject to assessment and taxation for the assessed or specially assessed value thereof uniformly with real property of nonexempt ownerships."

taxing other purchasers of power from the facility. *Id.* at 345-47. PPM now appeals from the Tax Court's decision.

We review decisions of the Tax Court for "errors or questions of law or lack of substantial evidence in the record." ORS 305.445 (2001). PPM raises two main issues on appeal. The first issue relates to whether the department may tax PPM's interest in the facility pursuant to the central assessment statutes, ORS 308.505 to 308.665 (2001), or pursuant to the municipal property statute, ORS 307.110 (2001). PPM argues that only ORS 307.110 (2001) applies and that the department cannot tax PPM under that statute because PPM does not "hold" the facility "under a lease or other interest or estate less than a fee simple[.]" ORS 307.110(1) (2001). Alternatively, PPM asserts that it does not "use" the facility, within the meaning of the central assessment statutes. PPM also argues that its contract rights are not assessable under the central assessment statutes because those rights are unrelated to any tangible or real property that is owned, held, or used by PPM. PPM also contends that it is, and has been, a separate entity from PKE and PacifiCorp Group and, therefore, it cannot be assessed and taxed based upon their separate contracts with the city. The second issue that PPM raises is that the department violated the constitutional guarantee of uniformity in taxation by not taxing the facility's three other purchasers of power.

For the following reasons, we conclude that the Tax Court erred by affirming the department's assessment of PPM based, in part, on contracts with PPM's affiliates. Despite that error, we affirm the Tax Court's decision, because PPM's own contracts with the city demonstrate that PPM "used" the facility under the central assessment statutes.

■ To address the first issue that PPM raises—that is, whether it is subject to assessment under the central assessment statutes or the municipal property statute—we must define the property subject to taxation. The Tax Court found that the "constellation of contracts" itself was the property "used" by PPM and assessed by the department. On review, however, both parties agree that the department actually assessed PPM's interest in the *facility*, including any of the

facility's real or personal property that PPM uses, but did not assess the contracts in and of themselves. After reviewing the record, we accept the parties' representation that the department assessed PPM's interest in the facility. We now address whether the department did so consistently with applicable statutes.

The parties agree that the city is the owner of the facility and that the city is a municipal corporation. Pursuant to ORS 307.090(1) (2001), therefore, the facility is exempt from taxation as public property, *"[e]xcept as provided by law"* (emphasis added).[8] As noted, the parties dispute what statute provides the exception applicable to this case. The department contends that the central assessment statutes, ORS 308.505 to 308.665 (2001), provided an exception to the general exemption, while PPM contends that the municipal property statute, ORS 307.110 (2001), provided the only applicable exception. The central assessment statutes require the department to assess and tax any entity that "use[s]" certain utility property, ORS 308.515(1) (2001) and ORS 308.510(1). In contrast, ORS 307.110 requires the taxation of publicly owned property that is "held under a lease or other interest or estate less than a fee simple" by any person whose real property is taxable. Taxation under ORS 307.110 (2001) required a "possessory interest" in the publicly owned property. *Sproul v. Gilbert*, 226 Or 392, 404-06, 359 P2d 543 (1961). For the reasons that follow, we agree with the department and conclude that ORS 308.515(1) (2001), which was part of the central assessment statutes, provides for the taxation of property otherwise exempt from taxation under ORS 307.090(1) (2001).[9]

---

[8] ORS 307.090(1) (2001) provided:

"Except as provided by law, all property of the state and all public or corporate property used or intended for corporate purposes of the several counties, cities, towns, school districts, irrigation districts, drainage districts, ports, water districts, housing authorities and all other public or municipal corporations in this state, is exempt from taxation."

[9] We do recognize, however, that ORS 307.110 is also an exception to ORS 307.090. In this case, we conclude only that the department need not base its taxation of PPM on whether it holds a "possessory interest" in the facility, as required by ORS 307.110; instead, the department may tax PPM if PPM "uses" the facility, pursuant to the central assessment statutes.

This court addressed a similar issue in *Western Generation Agency v. Dept. of Rev.*, 327 Or 327, 959 P2d 80 (1998). In that case, the court concluded that ORS 261.050 provided an exception to ORS 307.090(1) and allowed the department to assess an electricity generation facility and to tax an intergovernmental entity composed of a people's utility district and a municipal utility. *Id.* at 333. ORS 261.050 provides that *"[a]ll property * * * owned, used, operated or controlled by any people's utility district in [the business of electricity] shall be assessed and taxed * * * as * * * provided by law[.]"* (Emphasis added.) The court held that the facility at issue was "controlled" by a people's utility district and was therefore taxable under ORS 261.050. *Western Generation*, 327 Or at 333. The court rejected the taxpayer's argument that such a result would violate due process by improperly imposing a tax on the people's utility district and explained that the *property*, not the people's utility district, was subject to taxation. *Id.* at 333 n 6.

In this case, ORS 308.515 (2001) contained a directive similar to that set out in ORS 261.050 (2001). ORS 308.515(1)(a) (2001) provided that the department *"shall make an annual assessment"* of certain "property having a situs" in the State of Oregon (emphasis added), including

> *"any property* used or held for its own future use by any company in performing or maintaining any of the following businesses or services or in selling any of the following commodities, whether in domestic or interstate commerce or both, and whether mutually, or for hire, sale or consumption by other persons: * * * electricity[.]"

(Emphasis added.) ORS 308.510(1) (2001) defined "property," for purposes of the central assessment statutes, as

> *"all property*, real and personal, tangible and intangible, used or held by a company as owner, occupant, lessee, or otherwise, for or in use in the performance or maintenance of a business or service or in a sale of any commodity, as set forth in ORS 308.515 * * * but does not include items of intangible property that represent claims on other property including money at interest, bonds, notes, claims, demands and all other evidences of indebtedness, secured or unsecured, including notes, bonds or certificates secured by

mortgages, and all shares of stock in corporations, joint stock companies or associations."

(Emphasis added.) Further, ORS 308.505(3) (2001) defined "property having situs in this state" as *"all property*, real and personal, of a company, owned, leased, used, operated or occupied by it and situated wholly within the state[.]" (Emphasis added.) Those provisions establish that any property (including most types of intangible property) that a company uses in the performance or maintenance of an electricity business or in the sale of electricity is assessable. As in *Western Generation*, it is the property that is assessed and taxed to the company under ORS 308.515 (2001).[10] Therefore, as with ORS 261.050 (2001), ORS 308.515 (2001) provided an exception to the general exemption from taxation for municipal property set out in ORS 307.090 (2001).

We now turn to the question whether PPM "used" the facility, including its real and personal property, and tangible and intangible property. The department assessed the facility and taxed PPM, based upon several agreements between PPM, PKE, PacifiCorp Group, and the city. The department argues that all those contracts should be considered because, under ORS 308.517 (2001), the property could be assessed to any of the affiliated entities as "users" of the facility. The department admits, however, that it mistakenly understood, at the time of its 2002-03 tax year assessment, that PKE was a subsidiary of PPM. The department chose to tax PPM, because PPM appeared to be the "chief operating company," as distinguished from PacifiCorp Group, which the department understood to be a holding company of PPM and PKE.[11]

█ We must determine whether the department properly assessed and taxed PPM on the property of its affiliate, PKE, and its former parent, PacifiCorp Group. In *Southern Pacific*, 295 Or 47, this court addressed whether the property

---

[10] ORS 308.635(4) (2001), in turn, required assessed property to be taxed: "Taxes shall be levied and collected on assessments of properties so made, certified and apportioned in the same manner as taxes on other properties are levied and collected and at the same time and by the same officers."

[11] As noted earlier, PacifiCorp Group is no longer the parent of either PPM or PKE. The parent of those companies is PacifiCorp Holdings, Inc.

of one centrally assessed utility included the property of an out-of-state affiliate. In that case, Cottonbelt, a midwestern railroad, was affiliated with and nearly wholly owned by Southern Pacific, a centrally assessed railroad operating in Oregon. *Id.* at 49. The department included Cottonbelt in assessing Southern Pacific's property, and Southern Pacific challenged the assessment. *Id.* at 50. The court noted that that case "turn[ed] on whether the Cottonbelt railroad operations are Southern Pacific's 'property,' as that term is defined in ORS 308.510(1) and used in the rest of the statutory scheme." *Id.* at 59. The court then wrote:

> "The proper test of what this statutory scheme includes depends on concepts of *property*, 'real and personal, tangible and intangible, used or held * * * as owner, occupant, lessee, or otherwise.' ORS 308.510(1). The term 'otherwise' broadens the definition of property but, construed by the *ejusdem generis* rule, stays within this familiar arena. These concepts of property are more definite than the wavering tests of operational and economic integration. What shows a property connection between corporations is the right to control the operations of the other company. While overlap of officers is neither necessary nor sufficient to show that one company is the property of another, it is evidence of at least possessory control."

*Id.* at 62 (emphasis in original). The court concluded that Cottonbelt's property could be assessed to Southern Pacific, explaining that Southern Pacific owned 99.7 percent of Cottonbelt and exerted executive control over Cottonbelt's marketing, financing, management, operations, and labor. *Id.*

Here, the Tax Court did not address whether PPM had the right to control either PKE or PacifiCorp Group, because it erroneously described PKE as a "wholly owned subsidiary" of PPM. *Pacificorp Power Marketing*, 17 OTR at 338. Based upon that error, the Tax Court concluded that the "constellation" of contracts involving both PPM and PPM's affiliates were taxable intangible property. *Id.* at 340. The Tax Court erred by not analyzing whether PPM could be taxed for PKE's and PacifiCorp Group's property, consistently with *Southern Pacific*.[12] However, we may affirm the

---

[12] We conclude only that the Tax Court erred in not undertaking the analysis required by *Southern Pacific*. We express no opinion as to whether the corporate

Tax Court's decision, despite that error, if, considering only the four contracts between PPM and the city, PPM "used" the facility, pursuant to the central assessment statutes, during the tax year in question.

■■■ We turn now to the proper interpretation of the central assessment statutes. As with any other statute, this court "shall pursue the intention of the legislature." ORS 174.020. We first look to the text and context of the provision. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-11, 859 P2d 1143 (1993). In construing the text and context, we first look to the "plain, natural and ordinary meaning" of words. *Id.* at 611. If the legislative intent is clear after reviewing the ordinary meaning of the text and context, then no further inquiry is necessary. *Id.*

The word "used" appears in several different provisions of the relevant central assessment statutes. *See* ORS 308.515(1) (2001) (directing department to make an assessment of "any property *used or held* for its own future use") (emphasis added); *see also* ORS 308.505(3) (2001) ("property having situs in this state" includes "all property * * * of a company, owned, leased, *used*, operated or occupied by it") (emphasis added); ORS 308.510(1) (2001) ("property" includes "all property * * * *used or held* by a company") (emphasis added); ORS 308.517 (the department "shall assess to the property user all property owned, leased, rented, chartered or otherwise held for or *used* by it") (emphasis added). The statutes, however, do not provide a definition of the word "used." In ordinary usage, the verb "to use" means "to put into action or service[;] have recourse to or enjoyment of[;] employ." *Webster's Third New Int'l Dictionary* 2523-24 (unabridged ed 2002). Synonyms for that verb include to "employ, utilize, apply, avail." *Id.* at 2524. "Use * * * indicates any putting to service of a thing, usu[ally] for an intended or fit purpose or person[.]" *Id.* Those definitions of "use" make clear that some degree of control is necessary.

This court's prior decisions support that interpretation of "use." As noted earlier, this court's decision in *Southern Pacific*, 295 Or at 62, applied the concept of control

relationships described above could support the legal conclusion that the Tax Court reached.

to the central assessment statutes, though not to the definition of "use" specifically. Additionally, in *P.G.E. Company v. Tax Com.*, 249 Or 239, 437 P2d 827 (1968), this court reviewed the assessment, under the central assessment statutes, of lands on the Warm Springs Reservation that PGE had flooded pursuant to certain flowage easements. The court noted that the flowage easements "would seem to be non-possessory." *Id.* at 249. The court concluded, however, that it did not need to determine the precise nature of PGE's rights to the property because the agreement between PGE and the Confederated Tribes of the Warm Springs granted PGE rights to *use* the property. *Id.* In determining the appropriate valuation under the central assessment statutes, the court concluded that "the rules for the valuation of possessory interests in real property [were] fully applicable." *Id.* at 251. The court found "no distinction of substance between PGE's right to use the tribal lands and the rights usually enjoyed by a lessee of property from a tax-exempt owner." *Id.*

The similarities noted in *P.G.E. Co.* between possessory interests and rights to use property extend beyond the valuation context. For example, lessees of property generally exercise some degree of control over the leased property. Whether a taxpayer exercises control over property is also a component of the "possessory interest" test under the municipal property statute, ORS 307.110, advocated by PPM. As this court has explained,

> "although a 'possessory' interest always is marked by some degree of control and some degree of exclusivity, neither absolute control nor absolute exclusivity is required[.]"

*Power Resources Cooperative v. Dept. of Rev.*, 330 Or 24, 31, 996 P2d 969 (2000) (citing *Sproul*, 226 Or at 405-06).

We import similar principles of control to the test for determining whether a utility "uses" property under the central assessment statutes. By analogizing the concept of control as utilized in the "possessory interests" test, however, we do not equate "use" under the central assessment statutes with "possession" under the municipal property statute, which is shorthand for property "held under a lease or other interest or estate less than a fee simple," under ORS 307.110 (2001). The central assessment statutes clearly differentiate

between property that is "used" and property that is "held by a company as owner, occupant, lessee, or otherwise," ORS 308.510(1) (2001). *See also* ORS 308.505(3) (2001) ("owned, leased, used, operated or occupied"), ORS 308.515(1)(a) (2001) ("property used or held for its own future use"). Therefore, if "absolute control" is not necessary to show a possessory interest under the municipal property statute, absolute control is certainly not required to demonstrate mere "use" of a property under the central assessment statutes. "Use" does entail some degree of control over the property at issue, however. The property here is an electricity cogeneration facility; to have "used" that facility, therefore, PPM must have exercised some control over the facility's business. As explained below, based upon the aggregate of PPM's four contracts with the city, we conclude that PPM "used" the facility during the tax year in question.

PPM's power-purchase contract with the city entitled PPM to a specific amount of the facility's output: 237.7 MW (approximately 47 percent) of the facility's base output. Additionally, PPM's payments to the city for that output were tied to its share of the cost of the facility, and the length of the agreement was tied to the useful life of the facility. The power brokerage agreement allowed PPM to broker, for a fee, the sale of the remaining 53 percent of facility output, as the city's exclusive selling agent. PPM also received an annual incentive bonus for its brokerage efforts.

PPM's management contract with the city also allowed PPM to exercise control over the facility. Under the management agreement, PPM "perform[ed] all administrative work of the facility," including administering the power-purchase agreement on a day-to-day basis and developing an annual budget. The city paid PPM a management fee as well as a performance incentive bonus. Further, that contract was a 20-year renewable contract with the city to manage the facility. That contract granted PPM "the nonexclusive right * * * to enter on the premises on which the Facility is located and to occupy and have free access to use the same for solely the purposes set forth in this Agreement."

PPM points out that those agreements imposed limits on PPM's control. As we concluded earlier, however, absolute control is not necessary for PPM to have "used" the

facility. We conclude that the provisions described above demonstrate that PPM's contracts with the city entitle PPM to "use" the facility.[13] We therefore hold that the department properly assessed PPM under the central assessment statutes. Accordingly, we affirm the Tax Court's grant of summary judgment to the department on PPM's claim that it had no taxable interest in the facility.

■ In its second assignment of error, PPM contends that the Tax Court erred in granting summary judgment to the department on its claim that the department violated the constitutional requirements of uniformity and equalization in assessment and taxation.

PPM bases its constitutional claim on two provisions of the Oregon Constitution. The first provision, found in the Bill of Rights, provides:

"No tax or duty shall be imposed without the consent of the people or their representatives in the Legislative Assembly; and all taxation shall be uniform on the same class of subjects within the territorial limits of the authority levying the tax."

Or Const, Art I, § 32. The second provision provides:

"The Legislative Assembly shall, and the people through the initiative may, provide by law uniform rules of assessment and taxation. All taxes shall be levied and collected under general laws operating uniformly throughout the State."

Or Const, Art IX, § 1. PPM contends that the department has violated those provisions by assessing it, but not also assessing the three other entities who have power-purchase agreements with the city. PPM argues that it is entitled to summary judgment on its constitutional claim or, alternatively,

---

[13] Federal courts, deciding issues of intergovernmental tax immunity, have similarly concluded that certain contracts, including management contracts, can give rise to taxable "use" of government property. *See, e.g., United States v. Muskegon,* 355 US 484, 486, 78 S Ct 483 (1958) (state is permitted to tax contractor who "us[es] the [federal] property in connection with its own commercial activities" where contractor was "free within broad limits to use the property as it thought advantageous and convenient in performing its contracts and maximizing its profits therefrom"); *United States v. Nye County,* 178 F3d 1080, 1085 (9th Cir 1999) (concluding that county could tax contractors who "use government property as they see fit in conducting their commercial activities").

that a triable issue of fact exists such that granting summary judgment to the department on PPM's constitutional claim was inappropriate. For the reasons explained below, we affirm the Tax Court's grant of summary judgment to the department on PPM's constitutional claim.

In *Penn Phillips Lands v. Tax Com.*, 247 Or 380, 385-86, 430 P2d 349 (1967), this court explained that, under Article I, section 32, and Article IX, section 1, "[t]he taxing authorities may not single out one taxpayer for discriminatory, or selective, enforcement of a tax law that should apply equally to all similarly situated taxpayers." This court has required that taxpayers asserting claims under Article I, section 32, and Article IX, section 1, like PPM, must demonstrate an intentional and systematic pattern of discrimination. *Freightliner Corp. v. Dept. of Rev.*, 275 Or 13, 17, 549 P2d 662 (1976).

PPM argues that it has demonstrated a pattern of discrimination on the department's part through the following facts: (1) the department assessed to PPM 47 percent of the cost of the facility, an amount corresponding to its power-purchase agreement; and (2) the department has not assessed any of the other three purchasers of power from the facility.

The department contends that the other three power purchasers are not similarly situated, so there is no pattern of discrimination based upon its refusal to assess those other three purchasers. The department explains that it did not assess PPM as merely a purchaser of power from the facility; instead, the department assessed PPM as a "user" of the facility based upon all the contracts between the city and PPM and its affiliates.[14] The department also points out that the terms of the city's power-purchase agreements with the other power purchasers are different from those in PPM's power-purchase contract. For example, the non-PPM power-purchase agreements involve shorter terms and smaller amounts of the facility's capacity. The department also points

---

[14] The department's inclusion of PPM's affiliates, whether or not correct, does not affect our analysis of PPM's constitutional claims.

out that, unlike PPM, the other power purchasers' contracts do not include "monthly demand charges."

PPM has not satisfied its burden of showing an intentional pattern of discrimination under this court's decision in *Freightliner*, 275 Or at 19-20. In that case, the taxpayer challenged the department's omitted-property assessment after the taxpayer had lost a previously recognized exemption, where the department did not initiate similar omitted-property assessments in four instances where other taxpayers had lost a previously recognized exemption. *Id.* at 16. In that case, this court assumed that the department had "committed errors in judgment," but concluded that such errors were "insufficient to show an intentional violation of the 'principle of practical uniformity.'" *Id.* at 20 (quoting *Sunday Lake Iron Co. v. Wakefield*, 247 US 350, 353, 38 S Ct 495 (1918)).

Here, PPM has not demonstrated that the department's failure to assess the three other power purchasers constituted an intentional, systematic, or arbitrary discrimination against PPM, as required by *Freightliner*, 275 Or at 19-20. The department has offered nondiscriminatory reasons for the differing treatment, and PPM has not offered evidence to refute those reasons. Because PPM had the burden to present evidence sufficient to create an issue of material fact, TCR 47, and did not satisfy that burden, we affirm the Tax Court's grant of summary judgment to the department on PPM's constitutional claim.

In summary, we hold that the central assessment statutes, ORS 308.505 to 308.665 (2001), provided an exception to the public property tax exemption outlined in ORS 307.090 (2001), that otherwise would apply to the facility in this case. We also hold that the Tax Court erred by considering contracts held by entities affiliated with PPM to constitute intangible property taxable to PPM without first determining that PPM had controlled those entities. Despite that error, we affirm the Tax Court's grant of summary judgment to the department on PPM's statutory claim, because PPM's four contracts with the city demonstrate PPM's "use" of the facility under the central assessment statutes. Finally, we conclude, like the Tax Court, that PPM failed to satisfy its

burden to show any constitutional violation and therefore affirm the Tax Court's grant of summary judgment on PPM's constitutional claim.

The judgment of the Tax Court is affirmed.